**IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**COSTELLA RUDD-BROWN**                                                    **PLAINTIFF**

**v.**                               **5:04CV00423-WRW**

**ARKANSAS DEPARTMENT
OF COMMUNITY CORRECTION**                                        **DEFENDANT**

**<u>ORDER</u>**

Plaintiff alleges that she was subjected to unlawful discrimination on the basis of race in job assignments, employment conditions, promotion and benefits in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 1981and 1983, the 14th Amendment, and the Arkansas Civil Rights Act.[1]  Plaintiff also asserts that disparate treatment and retaliation were so harsh that she was forced to resign; i.e. constructively discharged.  Defendant has moved for Summary Judgment (Doc. No. 9).  Plaintiff has responded (Doc. Nos. 23, 28).  For the reasons set forth below, the Motion for Summary Judgment is GRANTED.

**I.**      **History**

On September 20, 1999, Plaintiff applied for the positions of (1) Counselor, Grade 18 position, (2) Substance Abuse Program Leader, a Grade 19 position, and (3) Clinical Supervisor, a Grade 20 position with the Arkansas Department of Corrections ("ADC").[2]  Plaintiff was offered and accepted the Substance Abuse Program Leader position on December 3, 1999.[3]

---

[1] Ark. Code Ann. § 16-123-101 (Supp. 2001).

[2] Doc. Nos. 9-3 and 33-2, p. 3.

[3] Doc. No. 9-4.

1

In October 2000, the ADC advertised the positions of Clinical Supervisor, a Grade 20 position, and Treatment Coordinator, a Grade 21 position. Plaintiff applied for both positions.[4] Bernie Lamb, an Asian-American male, and Melody Rogers, an Asian-American female,[5] also applied for the Treatment Coordinator position. Rogers, who already held the position of Clinical Supervisor, was given the Treatment Coordinator position.[6] Plaintiff was given the Clinical Supervisor position on November 27, 2000.[7]

Within two months of accepting the Treatment Coordinator position, Rogers resigned and the position was re-advertised.[8] Plaintiff did not submit an application for the position.[9] Ken Robinson, a white male, was awarded the position. On March 14, 2001, Robinson accepted a position out-of-state and resigned as Treatment Coordinator.[10] Plaintiff applied for the position on March 19, 2001. On May 3, 2001, four applicants (Plaintiff, a white female, and two African-American males) were interviewed.[11] None of the four applicants were offered the job, and it was re-advertised.[12]

---

[4] Doc. No. 9-5, p. 2.

[5] Doc. No. 33-2, p. 4-6.

[6] Doc. No. 9-5, p. 2.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

2

Plaintiff, with six other applicants, applied for the Treatment Coordinator position in July 2001. On August 23, 2001, four applicants (including Plaintiff) were interviewed. The position was offered to Annette Lane, an African-American female, but she turned down the offer.[13] The position, which had been unfilled since March 2001, was advertised for the third time. Plaintiff did not re-apply for the Treatment Coordinator position.[14] After interviews on October 24, 2004, Moki Ellison, a white female, accepted the position.[15]

Phyllis Callaway-Silas, the Center Supervisor, discovered in early March 2004, that many of the treatment files were not being reviewed on a monthly basis.[16] On March 2, 2004, Moki Ellison, the Treatment Coordinator, Plaintiff and Beverly Holler, the two Clinical Supervisors, were each reprimanded for their failure to timely review the treatment files.[17] Ellison and Holler received verbal warnings, but because Plaintiff had already received a previous verbal warning for "failing to audit resident files," Plaintiff was given a written warning.[18]

After receiving the written warning on March 2, 2004, Plaintiff prepared a Memorandum entitled "Treatment Files/Non-Compliance," wherein she acknowledged that there were deficiencies in her performance.[19] Nowhere in the memo does Plaintiff allege discrimination. Rather, she argues

---

[13] Doc. No. 9-5, p. 3.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Doc. No. 9-7.

[18] *Id.*

[19] Doc. No. 9-8 ("I am aware that there are deficiencies, as you have so avidly pointed out, and there will continue to be, until more staff and resources are available.").

that the deficiencies will continue as long as her department is under staffed. On March 3, 2004, Plaintiff submitted her letter of resignation, in which she stated that she felt "blessed to have been able to share both positive and negative experiences while here."[20]  Before she left, Silas conducted an exit interview.  In her deposition, Silas states that "at no time during our meeting did [Plaintiff] state to me that she felt she was being discriminated against or being treated differently based on her race."[21]

In her April 6, 2004, application for unemployment benefits, Plaintiff stated that she was terminated under duress.[22]  In its denial of unemployment benefits entered on April 20, 2004, the Arkansas Employment Security Department found that Plaintiff had "left work voluntarily and without good cause."[23]  Plaintiff appealed the denial of benefits on April 28, 2004.[24]  After a hearing on Plaintiff's appeal on May 17, 2004, the Arkansas Appeals Tribunal affirmed the denial of benefits finding that Plaintiff "did not complain of discrimination" and "quit" after receiving a reprimand.[25]  Plaintiff then appealed that decision to the State Board of Review.  In an opinion entered on July 9, 2004, the Board of Review affirmed the denial of benefits finding that Plaintiff had not shown "good cause" for quitting her job.[26]

---

[20]Doc. No. 9-9.

[21]Doc. No. 9-5, p. 4.

[22]Doc. No. 9-10.

[23]Doc. No. 9-11.

[24]Doc. No. 9-12.

[25]Doc. No. 9-13.

[26]Doc. No. 9-14.

Having been denied unemployment benefits, Plaintiff filed a charge with the EEOC on August 24, 2004.[27] In the charge, she alleged race discrimination.[28] Plaintiff was issued a right to sue letter on August 26, 2004.[29]

## II.     Standard of review

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[30] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[31]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[32] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[33] This court must view the facts in the light most

---

[27] Doc. No. 9-15.

[28] *Id.*

[29] Doc. No. 9-16.

[30] *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed R. Civ. P. 56.

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[32] *Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[33] *Id.* at 728.

favorable to the party opposing the motion.[34]  The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[35]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[36]

**III.    Analysis**

Plaintiff asserts that she suffered race discrimination and retaliation in violation of Title VII, § 1981, § 1983 and ACRA.   The burdens of proof for claims brought under Title VII, § 1981, and § 1983 are identical.[37] Likewise, claims under ACRA receive the same analysis as Title VII claims.[38] Therefore, this Order will consider the Title VII claims as including the § 1981, § 1983, and ACRA claims.

---

[34]*Id.* at 727-28.

[35]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (*quoting City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[36]*Anderson*, 477 U.S. at 248.

[37]*See Roark v. City of Hazen*, 189 F.3d 758, 761 (8th Cir. 1999); *see also Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1216 (8th Cir. 1990).

[38]Ark. Code Ann. § 16-123-105 (Supp. 2001).

A.     **EEOC**

Under Title VII, an EEOC charge must be filed within 180 days of the alleged discriminatory conduct.[39] Plaintiff first applied for the Treatment Coordinator position in October 2000. Thereafter, Plaintiff applied for the Treatment Coordinator position on March 19, 2001 and on July 30, 2001. After not receiving the position in July 2001, Plaintiff did not apply for any other position with the ADC. The Supreme Court has explicitly held that failure to promote is a discrete act requiring a timely charge of discrimination.[40] Because Plaintiff did not file her EEOC claim until August 24, 2004, her failure to promote arguments are time barred as a matter of law.

B.     **Eleventh Amendment**

The Eleventh Amendment to the U.S. Constitution prohibits a plaintiff from suing a state, state agency, or state employee in the employee's official capacity for damages, except insofar as the state or the Congress of the United States has abrogated the state's sovereign immunity.[41] The ADC is immune from suit for money damages under both § 1981, § 1983 and ACRA; therefore[42] all Plaintiff's § 1981, § 1983, and ACRA claims for money damages against the ADC are dismissed

---

[39]*See* 42 U.S.C. § 2000e-5(e)(1) (180-day limit under Title VII); *Shempert v. Harwick Chem. Corp.*, 151 F.3d 793, 796 n. 3 (8th Cir. 1998) (180-day filing limit in Arkansas).

[40]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Tandeme v. Saint Cloud State Univ.*, 328 F.3d 982, 987 (8th Cir. 2003) (rejecting continuing violation theory to failure to promote).

[41]*See, e.g.*, *Morstad v. Department of Corrections and Rehabilitation*, 147 F.3d 741, 744 (8th Cir. 1998) ([A]bsent a waiver, the Eleventh Amendment immunizes the state and its officials from § 1983 liability.).

[42]*Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

because it has Eleventh Amendment Immunity and is not a "person" for claims of this nature.[43] Plaintiff's claims for prospective injunctive relief remain.[44]

Title VII abrogates a states' Eleventh Amendment immunity in accordance with § 5 of the Fourteenth Amendment.[45] Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII.[46] Further, Title VII is designed to protect individuals, such as Plaintiff, from discriminatory animus and all its inequitable manifestations. Because Title VII claims against the state and its agencies are not barred by the Eleventh Amendment, Plaintiff's Title VII claims remain.

**C.     Discrimination**

Title VII prohibits an employer from treating an employee differently with respect to the "terms, conditions, or privileges of employment" because of her race.[47] "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."[48] In order to establish a *prima facie* case of racial disparate treatment, the plaintiff must prove (1) that she is a member of a protected class; (2)

---

[43] *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

[44] *Coller v. State of Missouri, Department of Economic Development*, 965 F. Supp. 1270, 1276 (W.D. Mo. 1997).

[45] *Okruhlik v. University of Arkansas*, 255 F.3d 615 (8th Cir. 2001); *Maitland v. University of Minnesota*, 260 F.3d 959 (8th Cir. 2001).

[46] 42 U.S.C. § 2000e-3(a); *McNeail-Tunstall v. Marsh USA*, 307 F. Supp. 2d 955 (W.D. Tenn. 2004).

[47] 42 U.S.C. § 2000e-2(a)(1).

[48] *Bradley*, 232 F.3d at 633.

that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that the defendant treated similarly situated, non-minority employees more favorably.[49]

There is no question that Plaintiff, an African-American, is a member of a protected class. Nor does Defendant dispute that Plaintiff was qualified to perform her job. Instead, the question is whether Plaintiff suffered an adverse employment action and whether similarly situated, non-minority employees were treated more favorably. Plaintiff has not presented sufficient evidence to withstand summary judgment.

Plaintiff primarily raises the following as proof of discrimination: (1) the ADC's denial of her requests for promotion; (2) retaliation; and (3) unmanageable workload not given to those similarly situated. Plaintiff's failure to promote claims were disposed of above and will not be addressed again.

Plaintiff argues that she was retaliated against for filing internal grievances of discrimination. To establish a *prima facie* case of retaliation, a plaintiff must show that she engaged in statutorily protected activity, that the defendant took adverse action against her, and a connection between the two.[50] The defendant may then rebut the plaintiff's case by showing a legitimate, nonretaliatory reason for the adverse employment action.[51] "If the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal retaliation."[52]

---

[49]*LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 693 (8th Cir. 2001).

[50]*Montandon v. Farmland Industries, Inc.*, 116 F.3d 355 (8th Cir. 1997).

[51]*Shanklin v. Fitzgerald*, 379 F.3d 596, 603-604 (8th Cir. 2005).

[52]*Id.*

Plaintiff cannot establish that she participated in statutorily protected conduct.[53]  Plaintiff maintains that she filed internal grievances when she was denied promotions and complaining that the "selection process was rigged to keep a white person at a higher position of the treatment program."[54]  Sherry Enderle, the ADC's Grievance Officer, who has sole responsibility to receive "all employee grievances filed," stated in her deposition testimony that she has no record of Plaintiff ever filing a grievance.[55]  Moreover, the Center Supervisor, Phyllis Silas, maintains that Plaintiff never complained of discrimination.

Plaintiff did write several memos to her superiors.[56]  A review of the memos reveals that Plaintiff complained about the amount of work required of her but did not complain about racism or the hiring selection process.  At a minimum, there has to be factual allegations of discrimination against a member of a protected group and the beginning of a proceeding or investigation under Title VII.[57]  Because no evidence has been presented that Plaintiff participated in a statutorily protected activity, Plaintiff's retaliation claims fail and are DISMISSED.

Finally, Plaintiff alleges that she was given an unmanageable work load that other similarly situated employees were not.  Despite Plaintiff's assertions, the other Clinical Supervisors were assigned the same duties.[58]  Plaintiff admits in her affidavit that Clinical Supervisors "came and went

---

[53]*Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998) (Plaintiff must have personally engaged in protected conduct).

[54]Doc. Nos. 30-1, 30-2, p. 16-17, 32-3.

[55]Doc. No. 9-17.

[56]Doc. No. 30-2, Exhibits 2, 3, 5, and 6.

[57]*Ghane v. West*, 148 F.3d 979, 983 (8th Cir. 1998).

[58]Doc. No. 9-18.

due to the constant over-stretching demands . . ." Plaintiff goes on to say " . . . I was strapped for resources and personnel to do the enormous tasks placed on my desk . . . however, I continued to try to bring to the attention of my [supervisors] that my staff and I were overworked."[59] Plaintiff admits that Beverly Haller, a fellow Clinical Supervisor and a white female, was required to do the same work. In fact, Plaintiff attached a memo written by Haller to their mutual supervisor, Moki Ellison, complaining about the amount of work she and Plaintiff were being required to accomplish.[60]

Plaintiff has failed to establish that she was treated differently than other similarly situated employees. The work may have been burdensome, but everyone was being asked to do the same work. More importantly, Plaintiff's rate of pay and rank never changed. Therefore, she has failed to establish any adverse employment action.

### D. Constructive Discharge

In her final argument, Plaintiff claims that she was forced to resign due to the burdensome work environment. "A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation."[61] "An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged."[62]

---

[59]Doc. No. 30-1.

[60]Doc. No. 30-2, Exhibit 4.

[61]*Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005).

[62]*Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996).

11

In the present case, Plaintiff was reprimanded on March 2, 2004 and quit the following day. The ADC was not given an opportunity to fix the problem because Plaintiff never filed a grievance. In her exit interview, Plaintiff did not mention discrimination and in her letter of resignation, she said that she was "blessed to have worked there." Based on the above, there has been no showing that Plaintiff was constructively discharged.

### E. Constitutional Allegations

Plaintiff alleges federal civil rights violations - - namely, violations of due process and equal protection guaranteed by the Constitution and § 1981, § 1983. Plaintiff's allegations fail to trigger any Due Process Clause or Equal Protection Clause protections as a matter of law. The Fourteenth Amendment to the United States Constitution provides that a State shall not deprive any person of life, liberty, or property, without due process of law. Because it has already been determined that Plaintiff failed to prove a violation under any of her causes of action, Plaintiff's constitutional claims also fail as a matter of law.[63]

## IV. Conclusion

Plaintiff has failed to establish a *prima facie* case of disparate treatment; therefore, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 28th day of June, 2006.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[63]*Valadez v. Graham*, 474 F. Supp. 149 (D.C. Fla. 1979) (Since court ruled that there had been no violations of federal law or constitutional principles, claims of civil rights violations based on the same constitutional and statutory provisions must fail as a matter of law.); *see also Mosby v. Mabry*, 697 F.2d 213, 215 (8th Cir. 1982).